THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* HARRY VAN ARSDALE and Another, Appellants.*

First Department, December 7, 1934.

* Appeal dismissed, 266 N. Y. ——.

*Frank P. Walsh* of counsel [*John Walsh* and *Harold Stern* with him on the brief; *Frank P. Walsh* and *William P. Ryan*, attorneys], for the appellant Harry Van Arsdale.

*James D. C. Murray* of counsel [*Irving Greenberg* with him on the brief; *James D. C. Murray*, attorney], for the appellant Max Rosenberg.

*John C. McDermott* of counsel [*William Copeland Dodge, District Attorney*], for the respondent.

GLENNON, J. The defendants, Harry Van Arsdale and Max Rosenberg, were convicted in the Court of General Sessions of the crime of assault in the first degree, and were sentenced to State prison for a term of not less than six years, nor more than twelve years.

In the indictment it was charged that the defendants, on the 24th day of February, 1933, feloniously assaulted and shot one William Sorenson.

The defendants entered a plea of not guilty. The issue was a rather narrow one. After reading the entire record in this case, it is difficult to determine exactly wherein the truth lies. It is not disputed that Sorenson was shot on the 24th day of February, 1933, at 130 East Twenty-fifth street, New York city, in the premises occupied by the International Brotherhood of Electrical Workers, Local No. 3.

The defendant Van Arsdale was a business agent of the union, while defendant Rosenberg, although a member, held no official position. Sorenson was a member of a group which was styled on the trial as the opposition, and also, rank and file. For the

purpose of establishing a motive on the part of the defendants for the commission of the crime, the People offered evidence to the effect that on the night before the shooting, at a meeting of the members of the union held in the Central Opera House, Sixty-seventh street and Second avenue, a discussion arose concerning a twenty per cent reduction in wages on certain types of work, during the course of which, Sorenson testified, he voiced his opinion against the reduction, whereas Van Arsdale spoke in favor of it. He admitted, however, that he never had any trouble with Van Arsdale. In so far as the defendant Rosenberg is concerned, Sorenson stated that he had never known him before the day of the shooting. No attempt was made to establish a motive on the part of Rosenberg for the commission of the crime by proof of anything which might have transpired prior to the date mentioned in the indictment.

Sorenson admitted that, after the meeting at the Central Opera House, he went to a bakery shop at Eighty-sixth street and Third avenue in company with ten or fifteen other members of the opposition. He was asked if one Alfred Terry, who was later called as a witness for the People, did not tell those present, in substance, that they should go to the union headquarters on the following morning for the purpose of cleaning out the place. He asserted, in answer thereto, that he did not hear it; that he remained only about fifteen minutes for the purpose of having a cup of coffee. On the following morning Sorenson arrived at the union headquarters about eleven-thirty, and went up to the day room on the fifth floor, where he saw both defendants. While he was standing near the entrance both defendants walked toward him from the direction of the counter where food was served. It seems that this day room was set aside for the use of unemployed members and a cafeteria was located therein for the purpose of serving coffee and sandwiches free of charge. He was then asked: " Q. And what happened then? A. They got about a few foot away from where I was standing talking with Johnson, when Alfred Terry lunged, that is he ran past me and attempted to grab hold of Van Arsdale. Q. What happened after that? A. A general confusion took place, there were blows, punches thrown around and pushing. Q. And when this took place what did you do? A. I was pushed out on the landing proper. Q. Through that door? A. Yes. Q. What happened next? A. As I got out on the landing there were about six or seven men out on the landing at the time; that is when I got pushed out they got pushed out with me. And I started, I turned around, I went out on the landing backwards like and I turned and proceeded down the stairs. I had taken about two steps down the stairs

when I heard the report of a gun, and I felt an impact in my right shoulder. It hit me and spun me around. I turned and looked up the stairs and saw Van Arsdale with the gun in his hand pointing it down at me. I then proceeded to go down. I took about two more steps when Rosenberg, who was in front of me, had reached the intermediate stairway landing, turned and faced me, took a gun out of the belt of his pants and aimed it at me, fired, missed with the first shot and the second one hit me right in the stomach."

On the day he was shot Sorenson was removed to Bellevue Hospital where he remained for a period of eighteen days. Later he was transferred to the Flower Hospital. Rosenberg was not arrested until the latter part of March. Sorenson said that he charged Rosenberg with having shot him on the day he was first taken to the hospital. The record shows that his statement was taken by an assistant district attorney at Bellevue Hospital on the twenty-fourth of February, about one hour after the shooting. According to the stenographer, Sorenson was asked: " Q. Did you see a gun in Rosenberg's hand? A. No," and further he was asked by the assistant district attorney at Bellevue Hospital: " Q. What was the fight over? A. That I don't know; different things there. When the fight developed, it took place in the place where they served the coffee and they pushed out into the hall. Johnson was in the fight and this fellow Rosenberg and Van Arsdale was down stairs a little ways. Q. When they ran out of the place? A. Yes. Q. Did they have guns in their hands? A. Not until they got down to the foot of the landing. Then Van Arsdale pulled out a gun. He fired at me and the first bullet struck me in the stomach. I says, ' I am shot.' He fired another shot at me. * * * Q. How many shots were fired? A. Two fired at me. That is all I remember."

While Sorenson denied that the minutes taken by the stenographer, in so far as they pertained to these questions, were correct, experience has taught us that in all probability Sorenson did in fact make the statement which was testified to by the stenographer. The district attorney's minutes, to which reference has been made, were not in the possession of the defendants or their counsel, but were only produced after a long colloquy between court and counsel, pursuant to which the court finally decided to examine them.

Detective Matthew A. Byrne, who was in charge of the case, said that he first heard of Rosenberg's name in connection with the shooting on March 28, 1933. Furthermore he questioned Sorenson at Bellevue Hospital on the day he was shot, and, while Rosenberg's name was mentioned to him, Sorenson said he was not one of the men who shot him.

An examination of this record shows that, with the exception of Sorenson, the only witness who gave testimony to the effect that Rosenberg had a gun was one Adelbart Letscher who stated that, while talking to Sorenson after he was shot, " there were some shots coming up the stairs, and the shots came out of Rosenberg's gun."

Alfred Terry, whose name has heretofore been referred to, said, in effect, that Van Arsdale was walking in the direction of the door which was behind Sorenson. " I saw him pull a gun from his left hand pocket of his coat. I made a grab for Van Arsdale. I caught him on his left hand and also on his back. We had a tussle and went out in the landing of the fifth floor stairway. He shot Sorenson while he was on that landing, and also Frank Dooner." Furthermore, he said that he did not recall seeing Rosenberg in the day room at all. He admitted that he was at the restaurant at Eighty-sixth street and Third Avenue with about fifteen members of the opposition on the night before the shooting. He denied, however, that he had told the others to meet him on the following morning at the headquarters of the union for the purpose of " cleaning out the place." Suffice it to say, that practically every man who was in the restaurant on the night before the shooting was at the headquarters on the following morning at the time the crime was committed.

Frank Dooner, a witness called by the People, said, in substance, that after the trouble started he saw defendant Van Arsdale with a gun in his hand shooting down the stairs, " I decided to grab it, to get away from it." In so doing he claims he was shot in the right hand. However, on cross-examination, Dooner admitted that when questioned at Bellevue Hospital shortly after the shooting by the assistant district attorney in charge, he said that Van Arsdale had not shot him, and, furthermore, that Van Arsdale did not have a gun in his hand. On redirect, the reason assigned for his original statement was, that somebody, not connected with the defendants, had said, as he was leaving the building, " keep your mouth closed or you will get another one." Furthermore, he was asked, " Now, did you see a pistol in this defendant Rosenberg's hand at any time that day? A. That I could not say; I could not say that I did." The record then shows the following: " Q. Did Rosenberg have a gun at that time? The Court: Do you mean in his hand? He might have it in his pocket and he would not see it. Mr. Murray: I am only asking him what he saw. The Court: Did you see a gun in his hand when he walked in there? The Witness: Not in his hand; what he had in his pocket I could not say. By Mr. Murray: Q. Well, did you see it any

place, either in his hand or on his person?  A. I did not see it; in his pockets, I could not look in there.  I don't know where he had it, if he had it.  Q. I am only asking you if you saw a gun in the possession of this defendant Rosenberg?  A. No, sir."

We have reviewed at great length the testimony of the eye-witnesses called by the People for the purpose of showing that it is exceedingly difficult to ascertain wherein the truth lies when it is read in the light of the manifest contradictions and of the testimony adduced by the defendants.

Harry Walmer, a member of the union, was on the fifth floor at the time the trouble occurred.  It was his duty to open up the day room and the " coffee pot," and to purchase provisions.  About eleven o'clock Van Arsdale arrived at the day room.  " He came over to give me money to buy some coffee as I was short of funds. * * * Then as Van Arsdale left my desk he started for this exit and as he was about ten feet away from the exit, when the semicircle of fellows closed in on him and rushed him into the stairway."  He did not see Van Arsdale after the group closed in on him, since the crowd was too dense in the hallway and consisted of about twenty or thirty men.  He could not tell who fired the shots.

Edward Jantzen, the custodian of the building, was on the main floor.  About eleven o'clock he saw Sorenson, Terry, Godel and others whose names he did not know, enter the building. He heard Sorenson say while he was in the doorway on the Twenty-fifth street side, " We will get those —— I don't like to repeat it." Then the court stated, " I have heard all the bad words in the world.  Repeat it."  Thereupon the witness repeated the vile names he asserted Sorenson used.

According to defendant Van Arsdale, he arrived at the building about eleven o'clock.  His office was located on the third floor. He learned that Harry Walmer wanted to see him.  He went up to the day room in order to give Walmer, who was in charge, some money with which to purchase provisions.  While on his way over to the latter's desk he was stopped by a group of men who inquired, " Where is Max Potax? "  He informed them that he did not know.  After he had talked to Walmer he started for the door and just as he reached the entrance to the staircase, he asserted, " Terry grabbed hold of me and the whole crowd started punching me."  He was forced into a corner of the landing, and, while the opposition was punching him, he heard shots.  He denied that he had a revolver in his hand.  When the shots went off the group left him and he ran downstairs to the office on the third floor.  After he closed the door a shot was fired through it.  When asked if he observed any person with a gun in the hallway, he

said, " I saw Edward Hoffman put something right in his shoulder, and the man was shaking like that." It might be well in passing to note that Hoffman was one of the opposition group.

William Borstel, called by the defense, stated that he saw Van Arsdale standing at the table in the day room, and decided to wait until he came out so that he could ask him if he knew where he could locate a position. As Van Arsdale was walking out these fellows "made a rush." He said that Van Arsdale did not have a gun.

Henry Gold, a member of the union, was on the fifth floor. In substance he corroborated Van Arsdale as to what transpired in the day room. While he heard shots, he did not see who fired them.

Emanuel Grabfelder, a member of the union, said he was in charge of the refreshment counter under Harry Walmer. When Van Arsdale came upstairs he was approached by five or six men and asked, " Where is Potack? " Van Arsdale continued over toward Walmer. Then he heard somebody call out, " Let's get him; " and then they started to fight. He did not see what took place on the landing, although he did hear some shots fired.

William Kuebler said that, at about eleven-thirty, a group of men came up the stairs into the day room, and that about ten minutes thereafter Van Arsdale appeared. While he was returning from the desk the witness noticed a crowd of about twenty or thirty gather around him. One struck him and then they pushed him out in the hall. He heard two shots fired but did not see a revolver.

Julius Preses saw Van Arsdale in the day room. He said that while the latter was walking towards the door he saw a crowd of at least twenty-five men standing there. They rushed to hit Van Arsdale and pushed him out into the hall. He did not see a gun although he heard two shots fired.

Henry J. Hayden, who was a member of the union for twenty-five years, said that he was in the day room when " this crowd of fellows came up there dressed in jerkins with gloves on." One of the crowd asked, " Where is Potack? " Shortly thereafter, Van Arsdale appeared. As he was about five feet from the door, " one of the brothers took a poke at him; * * * they rushed, pushed him in a corner." They were punching at him, and while doing so a shot was fired. He stated that Van Arsdale did not have a revolver in his hand.

Thomas Clements said that he saw the crowd strike a man who was following Van Arsdale. Van Arsdale and the other man were pushed into the hallway and that was all he could see. He also heard shots fired.

John T. Kelly, a business agent of the union, stated in substance that before Van Arsdale went upstairs he had requested him to bring the money to Walmer, but he declined to do so at the time, as he was busy talking to a member. About six or seven minutes thereafter a stampede started. He saw the defendant Rosenberg come running down the stairs and quoted the latter as saying, " They are gun crazy up there." He heard two shots. He heard Van Arsdale say, " They have a gun." He entered the office on the third floor with Van Arsdale and within a fraction of a second thereafter a shot was fired through the door.

Belle Ehrlich, a stenographer employed by the union, testified that after Van Arsdale entered the office a shot was fired through the door. Van Arsdale did not have a gun in his hand when he entered the room.

Frank Wilson, the president of the union, gave testimony which substantially corroborated Van Arsdale's version of what transpired on the third floor.

Julia Matthias stated that she heard men running. Van Arsdale came into the office and shouted to call the police, and a shot came through the door.

Dennis J. Crimmins said that as Van Arsdale was going into the office after the commotion, he shouted, " Shut the door, one of them has a gun." Almost immediately thereafter a shot came through the panel of the door.

Christian Hildebrand testified that he was standing in the hall-way on the third floor. He heard two shots fired and saw " a big mob come running down. * * * A big fellow came chasing them down with a gun in his hand and he went towards the door and rapped on the door, ' Open that door, open that door, if you don't, I will shoot,' with that he fired a shot through the door." He said that Van Arsdale did not have a gun in his hand. This witness appeared before the grand jury about nine months before the trial. He asserted in effect that he there testified substantially the same as he did upon the trial. After he left the stand the record quotes the court as saying, " Let that witness stay in the room." It further quotes the court as saying: " The Court: As the stenographer did not make a note on his record of what happened at this time, I am dictating the following at the request of Mr. Walsh. After I said ' Let that witness stay in the room ' he went over there and sat down in the corner on my right. And then I said, ' Captain, do not let that witness leave the room.' I think that is exactly what happened."

Hugh Morgan was in the office on the third floor. His testimony tended to corroborate that of the defendant as to the firing of

the shot through the door. He was not on the *fifth* floor when the trouble occurred.

Edward C. Bader was on the third floor outside of the office. He heard shots fired. He saw some of the union officers and others run into the office on the third floor, " And as they got in the door there was a fellow coming running with a gun in his hand, chasing them. And they· closed the door and he fired — and they closed the door in front of him and he fired a shot. I said to him, What is the trouble, Mac; he says, I am a cop. And I figured well he is a cop, I will hang around with him, and I walked with him I guess about twenty-five or thirty feet into the other doorway, and he peered out, and probably there was nobody there, he put the gun in his back pocket, he pushed his coat aside and I seen a black holster there, he put the gun in and closed the door." It might be well to remark in passing that the People did not assert that any police officer fired a shot through the door.

Needless to say we have not attempted to relate at length everything that was testified to by the witnesses who were present either on the third or fifth floors. The purpose of quoting at great length from the record is to indicate our reasons for believing that prejudicial error was committed by the trial court which necessitates a new trial.

It will be remembered that the People were permitted to prove that at the Central Opera House meeting on the night of February twenty-third Sorenson and Van Arsdale entered into a discussion concerning a cut in wages, and that Van Arsdale took a position opposed to that of Sorenson. The defendants attempted, through one George Whitford, the recording secretary of the union, to give their version of what transpired on the same night. During the preliminary examination of this witness, without any objection on the part of the district attorney, the court said: " We are trying an assault case, Mr. Walsh. Get down to that. Is he a witness to the assault? Mr. Walsh: No, sir, but I am introducing his evidence because over our objection it was admitted on behalf of the People, what took place the night before. The Court: I did not hear any objection to that or I would have kept it out. Mr. Walsh: I will make my offer of proof. The Court: You mean about the meeting of the night before? Mr. Walsh: Yes." After certain questions which pertained to the minutes of the meeting were asked, the following appears in the record: " Mr. Walsh: Did your Honor object to my question as to how many members there were —— The Court: The testimony as I understand it is that there was a meeting the night before and there was some argument, which was not germane to the shooting as far as I can

see; that after that a number of members left, went up to a bakery shop or restaurant on Third Avenue and had coffee. I don't know what this previous meeting has to do with it. Mr. Walsh: I desire to offer in evidence — I now offer in evidence, if your Honor please, the minutes of the meeting, regular meeting of the International Brotherhood of Electrical Workers, Local Union No. 3, held at the Central Opera House, 205 East 67th Street, New York City, on Thursday, February 23rd, 1933, at 8:30 P. M." After a discussion as to the minutes, Mr. Murray said: " Perhaps we overlooked something. You see, Sorenson's testimony, if I recollect it, was that apparently this controversy arose over something he had said at a meeting the night before on the reduction of wages, and therefore he is imputing a motive to these defendants. The Court: I will sustain the objection as to that. Mr. Walsh: Exception."

Since the People were permitted to give their version of what transpired at this meeting for the purpose of showing that these defendants had a motive, which would actuate them to assault Sorenson, the defendants should not have been precluded from offering testimony which might indicate that no such motive, based upon any discussion, did in fact exist on the part of these defendants.

One Frank Flood, a member of the union, gave testimony to the effect that he was in the restaurant at Eighty-sixth street and Third avenue, after the meeting, and there he saw Terry and other members of the opposition. He said there were about forty present. He was asked: " While you were there did you hear Mr. Terry say to these men —— Mr. Santangelo: I object; he is going to include in his question the answer that he expects the witness to give. Let him tell what happened. The Court: Objection sustained, leading. Mr. Santangelo: I object to that as leading. The Court: You can ask him what it was. Q. Did you hear Mr. Terry say anything there that night in the presence of those other men? A. Yes, sir. Q. About how many of that group were in there at that time. A. I should judge around an amount of forty. Q. What did Mr. Terry say? The Court: Do you object to that? Mr. Santangelo: Yes, I object to that as immaterial, incompetent and irrelevant. The Court: Objection sustained. Mr. Walsh: I offer to prove by this witness —— The Court: What Mr. Terry said the night before is no defense to what happened next day. Objection sustained. Mr. Walsh: I desire to make my offer of proof. The Court: You have asked the question and I have ruled on it. I am not going to let you spread before the jury —— Mr. Walsh: I do not care to spread it before the jury. I will put it on the record out of the hearing of the jury. The Court: Conversation that was had the night before

has no bearing on what happened next day. Mr. Walsh: I asked Mr. Terry a specific question. The Court: That is a collateral matter. Mr. Walsh: May I state on the record —— The Court: Yes, by exception. Mr. Walsh: I cannot have an exception unless it appears on the record. The Court: You have my ruling on the question, and on that you have your exception. Anything favorable to your side is on there. Mr. Walsh: As I understand it I have to make my offer of proof to keep my record. I shall now ask the stenographer to note it, so that it will not be in the hearing of the jury. (Mr. Walsh dictates the following to the stenographer in a low tone of voice.) Mr. Walsh: I offer to prove by this witness that while he was there that Terry said that this thing has gone far enough and we will go up there tomorrow and clean the place out; we will meet there at eleven o'clock and I don't want any of you boys to have your overcoats on. (The stenographer reads Mr. Walsh's statement to the court.) The Court: I will sustain an objection to that. Mr. Walsh: I save an exception. That will be all, thank you, Mr. Flood."

If it is true that Terry did in fact say at the restaurant, as claimed by the defendant, " We will go up there tomorrow and clean the place out," it certainly would be pertinent to prove that fact to establish that it was the opposition group which was responsible for the shooting and not either one of these defendants.

We next come to the incident which occurred while the witness Letscher was on the stand. It will be remembered that this witness visited the district attorney's office on the twenty-seventh day of March. He was asked the following question: " Q. And after you left the District Attorney's office did anything happen to you? " The following then occurred: " Mr. Walsh: I object to anything that did or did not happen to this witness; that is not in the presence of this defendant and not connected with this defendant. The Court: Objection overruled. Mr. Walsh: Exception. The Witness: Well, Judge, your Honor, I was hit with a bottle of acid. Mr. Murray: I move for the withdrawal of a juror. I submit this is highly prejudicial. I think it is unfair and improper. The Witness: Yes, I was hit with a bottle of acid. The Court: Wait. Mr. Walsh: You said it twice. The Court: Pay attention to me, Mr. Witness. You must not answer questions when there is an objection until I have ruled whether the answer may be admissible or not. Now, I will have to strike it out and instruct the jury to disregard it. Mr. Walsh: When I object —— Mr. Murray: That answer was responsive to the District Attorney's question and he knew the answer he was going to get to the question and it is not a volunteered answer on the part of this witness. And not alone

is the vice of the situation, the fact that the prosecutor elicited it. I move for the withdrawal of a juror. The Court: Motion denied. Mr. Murray: Exception. Mr. Walsh: I would like to make an objection on the part of the defendant Van Arsdale, that I made my objection before this witness answered the question. The Court: Yes. Mr. Walsh: The Court let that go in. This District Attorney, I take it that he will not deny it, knew what the answer was going to be. The Court: That does not make any difference, whether he knew it or not."

During the course of his summation, even though the court had stricken the evidence out, the assistant district attorney said, " And doesn't the evidence of Letscher's subsequent physical condition make you think seriously as to whether there might have been some cause or grounds for such a fear? Mr. Murray: I object, if your Honor please, to that statement. There is no evidence whatever that these defendants threw acid. Mr. Santangelo: I did not say that. The Court: He did not say anything about that. Mr. Murray: That is the inference that he wants left. The Court: Objection overruled. Mr. Murray: Exception. Mr. Walsh: Exception, if your Honor please."

These defendants were in no way connected with the so-called acid throwing incident. It was, therefore, highly improper to have referred to it in the summation, and the court should have protected the defendants' rights.

Another incident worthy of note occurred during the summation of the assistant district attorney wherein he stated: " Both counsel for the defense very kindly waived their opening because they did not know what defense they were going to have." On objection by one of the attorneys for defendants, the court stated: " They have a perfect legal right to waive their opening." Then the record shows the following requests: " Mr. Murray: I ask your Honor now to instruct this jury that the fact that we did not open does not prove anything in this case and should not be the subject of comment. The Court: The jury can draw whatever inference it pleases. Mr. Murray: We except."

The court should have granted the request and should not have permitted the jury to draw any inference from the failure of defendants to open, since these defendants had a legal right to waive their opening. (Code Crim. Proc. § 388.)

It will be remembered that Christian Hildebrand, who was called as a witness by the defense, was not permitted to leave the court room after his testimony was completed. In fact, the court concededly said in part, " Captain, do not let that witness leave the room." The only inference which the jury could draw from the

detention of Hildebrand was that the court believed he had committed perjury, with the result that the jurors' minds might not only have been poisoned against this particular witness, but also against the defendants who had placed him on the stand. Hildebrand had been a member of the union for upwards of thirty-five years, from which we may deduce that he was not a young man and undoubtedly could have been taken into custody — if in fact the court believed he had committed an offense — after the trial of the case was completed, or, if absolutely necessary, outside the presence of the jury.

During the course of his charge, the incident was again referred to by the court, as follows: " As long as it was adverted to in summing up by one of the counsel, I think I shall say a word about Hildebrand.

" You have heard Hildebrand's testimony, and counsel has warned you not to be prejudiced by my telling the captain to ask him to stay there in the room, and he was there until after you had gone out. Of course, gentlemen, you should not be prejudiced by that in one way or the other. That has nothing to do with this case. The People produced evidence which showed that Hildebrand had told or failed rather to tell this story at another time. Hildebrand said he told this story about the unknown man and the smoking pistol in the Grand Jury room. The People have produced the Grand Jury minutes which were put in evidence and which show that he did not tell it. That is all that you need consider so far as that incident is concerned. You can take Hildebrand's testimony and give it exactly what weight and confidence you think is proper, and eliminate from your minds the fact that I asked him to remain in the room."

The attempt by the court during the charge to remove from the minds of the jury the exceedingly bad inpression which they must have had as the result of the detention of the witness, failed to remedy the evil which was done to these defendants. In view of what the court said, the jurors would have been justified in reaching the conclusion that Hildebrand had actually been taken into custody at the direction of the court.

The following statements which appear in the court's charge were highly improper: " Then we had a great deal of testimony about what happened on the third floor, and about an unknown man running down there, chasing them down with a gun.

" Of course, gentlemen, what happened after something else happened, does not necessarily have much probative force as to what happened previously. I think I might make that plainer by saying that whatever was done on the third floor, excepting in

the way of statements or admissions, does not prove who fired the shot on the fifth floor.

" If I walk downstairs now and have a conversation with someone on the ground floor of this building, that would not tend to prove one way or the other that I charged you gentlemen up here on the fifth floor about ten minutes to four; that would have to be proved from some other source. So I cannot myself see the very great importance of the testimony of what occurred on the third floor, but that is matter which you will consider and give such weight as you think proper."

When exception was duly noted to that part of the charge, the court said: " Gentlemen, you may consider all the circumstances. All I said on that was that I did not consider that what happened on the third floor had very much probative value as to who fired the shot on the fifth floor. I cannot personally see the connection. If you can, why do so."

It must be remembered that it was the contention of these defendants that neither one had a pistol in his hand, and furthermore, that one of the opposition group had fired the shots, and had even pursued Van Arsdale down to the third floor where his office was located.

We believe it unnecessary to discuss further the other points made by the appellants which tend to establish that these defendants did not have a fair trial. It is our belief that sufficient has been shown in this case to indicate that the errors pointed out are substantial.

In *People* v. *Wolf* (183 N. Y. 464) Judge VANN said: " An unfair trial, especially in a criminal case, is a reproach to the administration of justice and casts grave responsibility not only upon the prosecuting officer but also upon the trial judge. However strong the evidence against the defendant may be, if she did not have a fair trial, as shown by the rulings of the court subject to proper objections and exceptions, the judgment of conviction should be reversed and a new trial ordered so that she may be tried according to law."

The judgment should be reversed and a new trial granted.

FINCH, P. J., TOWNLEY and UNTERMYER, JJ., concur; MERRELL, J., dissents.

MERRELL, J. (dissenting). I dissent. The jury was justified in finding there was no reasonable doubt as to the guilt of the defendants. The errors complained of were trivial and could not have affected the result. The defendants were proven guilty. It was for the jury to decide.

Judgment reversed and a new trial ordered.